[No. G036029. Fourth Dist., Div. Three. Nov. 26, 2007.]

PAMELA M. MOKLER, Plaintiff and Appellant, v.
COUNTY OF ORANGE et al., Defendants and Appellants.

122

**COUNSEL**

Law Offices of H. Bryan Card, H. Bryan Card; Law Offices of Robert H. Pourvali, Robert H. Pourvali; Esner, Chang & Ellis, Stuart B. Esner and Andrew N. Chang for Plaintiff and Appellant.

Horvitz & Levy, Frederic D. Cohen, Kim L. Nguyen; Lynberg & Watkins, Norman J. Watkins and William F. Bernard for Defendants and Appellants.

**OPINION**

**ARONSON, J.**—Defendants County of Orange (County) and Chris Norby appeal from the trial court's denial of their motion for judgment notwithstanding the verdict (JNOV) following a jury determination that the County

terminated Pamela M. Mokler in violation of California's whistleblower statute, Labor Code section 1102.5, and that Norby sexually harassed Mokler, creating a hostile work environment under the California Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq. Defendants contend the trial court erred because Mokler's failure to exhaust her administrative remedies barred her from pursuing her retaliatory discharge claim. Defendants also challenge the sufficiency of the evidence to support her claims for retaliation and sexual harassment. Mokler appeals the trial court's order granting the County a new trial on damages, conditioned on Mokler refusing a damage award remitted from approximately $1.6 million to $125,000. Mokler challenges the sufficiency of the evidence to support the trial court's statement of reasons for overturning the jury's damages verdict.

We conclude the County waived its exhaustion defense by failing to raise it before trial. We also conclude that substantial evidence supports Mokler's retaliatory dismissal claim. Mokler's sexual harassment claim against Norby fails, however, because Norby's alleged harassment was not sufficiently severe or pervasive to alter the conditions of Mokler's employment and create an abusive working environment. We also conclude substantial evidence supports the new trial order on damages. We therefore reverse the trial court's order denying JNOV as to Mokler's harassment claim, but otherwise affirm the remainder of the JNOV order. We also affirm the new trial order.

I

FACTUAL BACKGROUND

Consistent with the standard of review, we set forth the facts developed in the record in the light most favorable to the judgment. (See *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 229 [30 Cal.Rptr.3d 145, 113 P.3d 1159].)

A. *The Latino Coalition Foundation (LCF) Proposal*

The Office on Aging (OoA) serves as an advocate for County residents age 60 and older. The office receives federal and state funding, and is required to meet federal and state mandates. In November 2000, the County hired Mokler as OoA's executive director. Mokler was first supervised by William Baker, the County's Director of the Community Services Agency, whose

oversight included the OoA. Baker consistently rated Mokler's performance as "exceptional" from the time she was hired until Baker retired in March 2003.

In December 2002, the federal government awarded OoA $800,000 as "one-time" funds, designated exclusively for new projects. The funds had to be spent no later than June 30, 2003, or they would revert back to the federal government. To solicit bids for projects, OoA issued requests for proposal (RFP) to approximately 1,000 agencies and providers. OoA received four proposals in response.

One of these proposals came from LCF, a nonprofit charity devoted to helping Latinos with health care issues. LCF proposed to use $212,000 to put together street fairs where LCF could provide health services information to the Latino community. One of the members of LCF's board of advisors was David Padilla, whom Mokler had recently dated. Under the County's standard procurement procedures, OoA forwarded the four proposals to an impartial evaluation committee to make funding recommendations to the board of supervisors. The first meeting of the evaluation panel took place on March 7, with a followup meeting scheduled for the next week to score the proposals.

While the evaluation committee considered the proposals, Mokler instructed Janice Parks, an OoA publicist, to obtain a copy of LCF's proposal and independently review its feasibility. Mokler explained she planned to place Parks in charge of the project if the panel recommended funding. She also sought to obtain a copy of the LCF proposal for Francisco Valle, one of the County's paid consultants, because of his expertise in Latino outreach and marketing. Mokler reasoned that given the tight deadline for using the funds, her team had to start working on the LCF proposal "[i]n warp speed" if approved by the committee.

Parks's initial attempt to obtain a copy of LCF's proposal failed. An OoA contracts staff member refused her request, explaining all proposals were confidential and available only to the evaluation committee. Christian Teeter, one of Mokler's subordinates who had access to the vendor's proposals, checked with the County Executive Office Purchasing Department and was told that providing Parks with a copy of the proposal would violate County policy. Upon learning of these developments, Mokler reviewed section 4.2.4 of the contracts manual, which provides: "Proposals will not be considered public information until action is filed with the Board of Supervisors for the specific purpose of making an award. Prior to contract award, proposals shall be accessible only to county personnel or other members of the proposal evaluation committee having a legitimate interest in them." After reviewing the manual, Mokler believed that Valle and Parks had a "legitimate interest"

in seeing the proposals and that she had the authority to decide they could review it. Based on this understanding, Mokler instructed Teeter to provide Parks and Valle with copies of the proposal, and then directed Parks to review the proposal.

After considering the LCF proposal, the review committee gave it a lower score than competing proposals, and the OoA communicated the committee's concerns to LCF. LCF's director, Robert De Posada, met with Mokler and Parks to discuss the issues raised by the panel, such as the short timeframe, the number of events, and LCF's failure to designate a local person to head the project. Based on these discussions, De Posada submitted a revised proposal which reflected a budget reduced from $212,000 to $122,000, and the selection of Padilla as the local project manager. Ultimately, the LCF proposal was not funded though the RFP process, but through a pilot project with the state.

## B. *The Hospital Van IFB*

While in Washington, D.C., Mokler met Carlos Olamendi, a member of the Latino Leadership Foundation, who suggested raising funds to pay off a loan coming due on the "diabetic outreach van" owned by Mission Hospital, which used it to provide services to the Latino community. Mokler later discussed the issue with Baker, who thought using the van to target diseases affecting the Latino population was a good idea. Baker then gave Mokler the green light to "sole source" the van, rather than opening a bidding process for other contractors. Because of concerns over the propriety of their procedure, a staff member suggested they fund the project through an "IFB" or invitation for bid process. After discussing the matter, Baker told Mokler: " 'just go along with it . . . .' " " 'The way to do it is to write a tight scope of work' " so that only Mission Hospital would receive the contract. Baker explained to her, " 'This is a little game we play in the county.' " Mokler nevertheless researched the existence of other organizations that could potentially compete for diabetic outreach to seniors in South Orange County, and found none.

## C. *Removal of the Contracts Department from OoA Oversight*

Baker retired on March 27, 2003, and Vicki Landrus was appointed interim Community Services Agency director the following day. On April 11, 2003, Landrus told Mokler the County planned to transfer OoA's contracts department to the County Executive Office Purchasing Department. In response, Mokler complained that this would violate the County's contract with the California Department of Aging (CDA), which allows the state to terminate its contract to fund OoA if the organizational structure of OoA is materially

changed.[1] Mokler also expressed her belief that removal of the contracts department violated both federal and state law.

On April 18, 2003, Mokler again complained to her supervisors and county counsel about the illegality of reorganizing the OoA. She also prepared a memorandum on the subject and asked Bill Mahoney, the County's assistant chief executive officer (CEO), to obtain an opinion from county counsel. On April 21, 2003, the County removed the contracts department from OoA and transferred supervisory responsibility to the County Executive Office Purchasing Department. On April 23, Mokler received a phone call from Mr. Rawlings in the County Executive Office Purchasing Department stating that Teeter is "effective immediately . . . reporting 100 percent to me." According to Mokler, this significantly changed the organization in the OoA because Teeter was the OoA's operations director and was in charge of various services such as contracts, gerontology, and health information. Mokler believed it was illegal to have Teeter report to Rawlings and shared her views with her supervisors on several occasions.

Concerned about these warnings, Mokler's supervisors instructed her, both verbally and in writing, not to communicate with the CDA. Worried that Mokler might leak information regarding the change to the CDA, Mokler's supervisors flew to Sacramento on May 2 and met with Ed Long, a CDA official, to short-circuit any allegation of illegal activity Mokler might report. According to Mokler, these supervisors misrepresented to Long the extent of the change to the organizational structure of the OoA.

D. *Administrative Leave and Notice of Intent to Discharge*

On May 5, 2003, Mokler's supervisors learned she had telephoned Long. Later that same day, the County placed Mokler on administrative leave and had her escorted out of her office building. On or about July 3, 2003, Mokler received a notice of intent to discharge, signed by Landrus. The notice accused Mokler of misconduct both in relation to the LCF proposal and the Mission Hospital diabetic van IFB. Specifically, the notice stated Mokler violated procurement policy by attempting to influence the evaluation committee's review of the LCF proposal, directing Teeter to provide copies of the LCF proposal to Parks and Valle, requesting that LCF receive more time to address the committee's concerns, meeting LCF representatives "for the purpose of rewriting their proposal," and failing to consult county counsel regarding the propriety of working with Padilla. Regarding the van IFB, the notice charged Mokler with attempting "to have this contract established

---

[1] The contract states, in pertinent part: "The state may terminate this agreement as a consequence of any of the following events: . . . The contractor's [OoA's] organizational structure has materially changed."

using the 'sole source' contracting procedure," and, once the invitation for bid method was chosen, directing staff "to keep the Scope of Work so tight that only Mission Hospital could receive the award." The conclusions listed in the intent to terminate letter largely tracked those of three separate internal investigations into Mokler's activities, conducted by the internal audit department, the CEO office, and employee relations/human resources.

### E. *The* Skelly *Hearing*

The County provided Mokler a *Skelly*[2] hearing on August 1, 2003, to determine whether to terminate Mokler's employment. James Ruth, the CEO, asked Daniel Hatton, the County's information officer, to preside over the hearing as a neutral decision maker. After approximately two hours of hearing, and upon further investigation, Hatton reached the following conclusions: (a) Mokler violated County policy by directing a staff member to rewrite a proposal to unfairly benefit an organization with personal ties to Mokler; (b) Mokler violated County policy by directing her staff to craft a restrictive IFB that had effectively excluded all bidders except the bidder Mokler favored; and (c) Mokler violated County policy by disregarding her supervisors' directives and engaging in insubordination. Hatton notified Mokler of her termination on August 8, 2003. In his letter of termination, Hatton explained to Mokler that she had a right to appeal his decision under the County's internal grievance procedures. Mokler, however, did not pursue this avenue.

### F. *Mokler's Interactions with Norby*

Mokler's duties as the OoA's executive director required her to interact with board members on almost a daily basis. On January 29, 2003, Mokler introduced herself to Supervisor Norby at a budget hearing shortly after he had been elected. Norby asked Mokler if she was married. When she said no, he replied: " 'So you're the aging nun.' " Mokler felt degraded by Norby's comment and reported the incident to Baker, who told her to be careful.

On February 5, 2003, Mokler encountered Norby at a hotel during a victory party for newly elected Supervisor Bill Campbell. Upon Mokler's greeting, Norby took her arm, pulled her to him so that the sides of their bodies were touching. Norby then said in a flirtatious manner: " 'Did you

---

[2] In *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206 [124 Cal.Rptr. 14, 539 P.2d 774], the Supreme Court recognized that permanent civil service employees have a property interest in continued employment that is protected by due process. Accordingly, before a civil service employee is discharged, she must be afforded certain procedural rights, including notice of the proposed action, a copy of the charges and materials upon which the action is based, and the right to respond either orally or in writing. (*Id.* at p. 215.)

come here to lobby me?' " When Mokler responded that as a staff member she does not lobby, Norby, who had two women standing next to him, responded: " 'Why not? These women are lobbying me.' " Norby also told Mokler she had a nice suit and nice legs, and looked up and down at her. Mokler pushed herself away. Shocked at his behavior, Mokler worried Norby's actions might affect her ability to work with him. Upon reporting this latest incident, Baker again told Mokler to be careful and that she needed " 'to win him over.' "

Mokler's third encounter with Norby occurred on March 3, 2003, at Norby's office. While she waited in the reception area, Norby appeared, told Mokler she looked nice, and put his arm around her. He then walked over to a large map and asked her where she lived. When Mokler hesitated, Norby demanded she provide her exact address. Norby then put his arm around Mokler again and, as he did so, rubbed her breast with his arm. Mokler quickly pushed herself away. As Mokler began to discuss the services provided by the OoA, Norby, with a male staffer present, interrupted her saying: " 'Why the "f[uck]" do you have to do something special for Mexicans?' " Norby's derogatory remark offended Mokler.

## II

### PROCEDURAL BACKGROUND

Mokler sued the County for breach of contract, wrongful termination, a gender-based "hostile work environment" claim under FEHA, and unlawful retaliation under Labor Code section 1102.5, subdivision (b). After motions for judgment on the pleadings, the trial court dismissed the breach of contract and wrongful termination claims, finding Mokler failed to "exhaust her internal administrative procedural remedies." Thus, Mokler proceeded to trial on her unlawful retaliation claim against the County, and hostile work environment claim against Norby.

The jury returned a special verdict in Mokler's favor on the retaliation claim, specifically finding that Mokler was "terminated from her employment with the County of Orange in retaliation for being a whistleblower," and awarded her $14,089.60 in past economic damages and $1,681,823 in past and future noneconomic damages. The jury also sustained Mokler's harassment claim, finding that Norby created a hostile work environment for Mokler, but concluded Mokler suffered no damages resulting from Norby's conduct. The trial court entered judgment on this claim against Norby, but nonetheless declared him the "prevailing party" and awarded costs in his favor.

The trial court denied defendants' JNOV motion on both the retaliation and harassment claims. Defendants also moved for a new trial based on jury misconduct, excessive damages, and insufficiency of the evidence. After "weighing the entire record," the trial court concluded the jury's noneconomic damage award was excessive, and ordered a new trial against the County on the issue of damages for the retaliation, conditioned on Mokler's rejection of a remittitur reducing her damages to $125,000. She rejected the remitted amount, and the trial court ordered a new trial on damages. Defendants now appeal the trial court's denial of their JNOV motion and Mokler appeals from the partial new trial order.

## III

### DISCUSSION

### A. *The County May Not Assert Exhaustion of Administrative Remedies for the First Time on Appeal*

The County contends Mokler's claim for retaliatory termination under Labor Code section 1102.5 was barred because she failed to exhaust her administrative remedies. The County concedes it failed to raise exhaustion on this claim in the lower court.[3] The County asserts, however, it may raise the issue for the first time on appeal because the exhaustion requirement is jurisdictional. We disagree.

The County relies on the California Supreme Court decision in *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942] (*Abelleira*), which declared the exhaustion of administrative remedies to be jurisdictional. This does not mean, however, a party may raise the issue for the first time on appeal.

In *Abelleira,* the court considered instances where a reviewing court may issue a writ of prohibition to prevent a lower court from acting without, or in excess of, jurisdiction. In its analysis, the court explained the various meanings encompassed in the concept of jurisdiction: "Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties. . . . [¶] But in its ordinary usage the phrase 'lack of jurisdiction' is not limited to these fundamental situations. For the purpose of determining the right to review by *certiorari*, restraint by prohibition, or dismissal of an

---

[3] Before trial, the County successfully challenged Mokler's causes of action for breach of contract and wrongful termination in violation of public policy based on her failure to exhaust the administrative remedies described in the memorandum of understanding governing her employment.

action, a much broader meaning is recognized. Here it may be applied to a case where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." (*Abelleira, supra,* 17 Cal.2d at p. 288.) The court then cautioned against interpreting the term "jurisdiction" too narrowly when applied in the context of a writ of prohibition or certiorari, concluding: "The concept of jurisdiction embraces a large number of ideas of similar character, some fundamental to the nature of any judicial system, some derived from the requirement of due process, some determined by the constitutional or statutory structure of a particular court, and some based upon mere procedural rules originally devised for convenience and efficiency, and by precedent made mandatory and jurisdictional." (*Id.* at p. 291.)

Applying this broad definition of "jurisdiction," *Abelleira* determined that exhaustion of administrative remedies is a jurisdictional prerequisite. In reaching this conclusion, the court did not hold that the exhaustion doctrine implicated a court's subject matter jurisdiction, but viewed it as "a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis,* and binding upon all courts." (*Abelleira, supra,* 17 Cal.2d at p. 293.)

In *Green v. City of Oceanside* (1987) 194 Cal.App.3d 212 [239 Cal.Rptr. 470] (*Green*), the appellate court acknowledged *Abelleira*'s determination that the exhaustion doctrine was jurisdictional, but concluded a party could not raise the issue for the first time on appeal. *Green* observed that exhaustion was not an "inflexible dogma," but was subject to numerous exceptions, "including situations where the agency indulges in unreasonable delay [citation], when the subject matter lies outside the administrative agency's jurisdiction, when pursuit of an administrative remedy would result in irreparable harm, when the agency is incapable of granting an adequate remedy, and when resort to the administrative process would be futile because it is clear what the agency's decision would be." (*Id.* at p. 222.) *Green* further explained: "Application of these exceptions may require 'a qualitative analysis on a case-by-case basis with concentration on whether a [p]aramount need for agency expertise outweighs other factors.' [Citations.] Application of a procedural doctrine subject to numerous exceptions and which may require case-by-case analysis is not the sort of issue which should fall outside the general rule of civil litigation that arguments and objections not raised and preserved in the trial court are waived on appeal." (*Ibid.*)

Moreover, *Green* recognized that exhaustion is a judicially created rule of procedure, which the courts should not allow a party to use inequitably. As *Green* observed, "We think it would be grossly unfair to allow a

defendant to ignore this potential procedural defense at a time when facts and memories were fresh and put a plaintiff to the time and expense of a full trial, knowing it could assert the failure to exhaust administrative remedies if it received an adverse jury verdict. The exhaustion doctrine is simply a 'procedural prerequisite' [citation] the City decided to forego. Having elected to put Green to his proof before a jury, the City's dissatisfaction with that result is an insufficient reason for reversal." (*Green, supra,* 194 Cal.App.3d at pp. 222–223.)

■ Although earlier cases tended to view the exhaustion doctrine as invalidating a court's subject matter jurisdiction, thus allowing a defendant to raise it at any time (see, e.g., *Sampsell v. Superior Court* (1948) 32 Cal.2d 763, 773 [197 P.2d 739]; *Jacobs v. Retail Clerks Union, Local 1222* (1975) 49 Cal.App.3d 959, 963 [123 Cal.Rptr. 309]; *Bleeck v. State Board of Optometry* (1971) 18 Cal.App.3d 415, 432 [95 Cal.Rptr. 860]; *People v. Coit Ranch, Inc.* (1962) 204 Cal.App.2d 52, 57 [21 Cal.Rptr. 875]), later cases have generally followed *Green* in concluding a defendant waives the defense by failing to timely assert it. (See, e.g., *Mission Housing Development Co. v. City and County of San Francisco* (1997) 59 Cal.App.4th 55, 67 [69 Cal.Rptr.2d 185]; *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1215 [61 Cal.Rptr.2d 447]; *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 976 [6 Cal.Rptr.2d 193]; *Wallis v. Farmers Group, Inc.* (1990) 220 Cal.App.3d 718, 735–736 [269 Cal.Rptr. 299], overruled on other grounds in *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384 [46 Cal.Rptr.3d 668, 139 P.3d 56]; *Sacramento County Deputy Sheriffs' Assn. v. County of Sacramento* (1990) 220 Cal.App.3d 280, 286 [269 Cal.Rptr. 6]; *Doster v. County of San Diego* (1988) 203 Cal.App.3d 257, 260 [251 Cal.Rptr. 507].)

Two more recent cases that did not follow *Green*, however, are *Hood v. Hacienda La Puente Unified School Dist.* (1998) 65 Cal.App.4th 435, 441 [76 Cal.Rptr.2d 448] and *Ohton v. Board of Trustees of California State University* (2007) 148 Cal.App.4th 749, 770 [56 Cal.Rptr.3d 111]. *Hood* appears to side with the earlier cases holding that a party may raise exhaustion at any time, but after noting the split in authority, *Hood* declined to decide the issue because "[i]n the present case, the issue was raised in the trial court and has been preserved." (*Hood,* at p. 441.) *Ohton* declares that "[f]ailure to exhaust administrative remedy is a jurisdictional defect that may be raised at any time by the parties or the court," but cites *Hood* as its sole support for this statement, although *Hood* expressly declined to consider this issue. (*Ohton,* at p. 770.)

The County contends the Supreme Court resolved the split in authority in *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311 [25

Cal.Rptr.3d 320, 106 P.3d 976]. There, the trial court sustained a demurrer based on the plaintiff's failure to allege exhaustion. The Supreme Court rejected the defendant's argument that the plaintiff could not contest the trial court's demurrer ruling on appeal because the plaintiff did not immediately challenge the decision by filing a writ petition for relief. The court explained in a footnote that the plaintiff's "failure to exhaust administrative remedies presents a jurisdictional question related to her statutory claims, and we may review it at any point in the proceedings." (*Id.* at p. 322, fn. 2.) Thus, the court did not say a party could *raise* the exhaustion doctrine at any point in the proceedings, but declared it could *review* at any point a trial court's determination requiring a party to show exhaustion.

■ The Supreme Court, however, did not address whether a defendant may wait until after trial to raise exhaustion, and did not note the clear split of authority on the issue. " 'It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered.' " (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680 [36 Cal.Rptr.3d 495, 123 P.3d 931].) We therefore conclude the County waived its exhaustion defense in the present case. ■ As recognized by *Green,* it is generally accepted that courts may excuse the failure to exhaust all available administrative remedies where the agency indulges in unreasonable delay. (See *Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 101 [26 Cal.Rptr.3d 744]; *Public Employment Relations Bd. v. Superior Court* (1993) 13 Cal.App.4th 1816, 1827 [17 Cal.Rptr.2d 323]; *Hollon v. Pierce* (1967) 257 Cal.App.2d 468, 476 [64 Cal.Rptr. 808].) By waiting to raise exhaustion until after a full trial on the merits, the County unmistakably engaged in "unreasonable delay." Moreover, the grievance procedures Mokler is accused of not following expressly provide they are subject to waiver by mutual consent. By failing to raise the issue before trial, the County implicitly consented to the trial court's jurisdiction over Mokler's retaliatory termination claim.

The County contends its failure at trial to raise exhaustion of administrative remedies on Mokler's retaliation claim did not waive the issue because the County had successfully asserted exhaustion on Mokler's breach of contract and wrongful termination claims in pretrial motions. The County notes that Mokler opposed the pretrial motions in part by arguing, as she does here, that exhaustion would have been futile. (See, e.g., *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 935 [16 Cal.Rptr.3d 849, 94 P.3d 1055].) The County reasons Mokler had the same incentive to produce evidence supporting futility when she opposed the pretrial motions as she would have had if the County had also asserted exhaustion against her retaliation claim. The County therefore concludes we have an adequate record to review Mokler's futility argument. We disagree.

Mokler's breach of contract and wrongful termination claims essentially duplicated her retaliation claim; therefore, the trial court did not foreclose her ability to recover damages when it granted the County's motion to dismiss on exhaustion grounds. Thus, Mokler's incentive to vigorously oppose the County's exhaustion defense to her breach of contract and wrongful termination claims was substantially less than if the County had raised exhaustion against her entire case.

More importantly, the trial court never provided Mokler the opportunity to present evidence on the futility exception in response to the County's pretrial motions. The court treated the County's in limine motions as motions for judgment on the pleadings. At the hearing, however, the court recognized that exhaustion may present factual issues, and requested the parties to seek an agreement on the pertinent facts. The court explained: "[D]uring the lunch hour I want you folks to sit down and tell me factually what you agree to, and if I can draw a legal conclusion from it, I will. If I can't, I may have to wait until the close of plaintiff's case, have you stand up, make your motion for nonsuit on the issue, but at least I'll have had a chance to say are there any facts which if believed by the jury or believed by me can get you [past] me on the exhaustion of remedies issue."

The parties reported back to the court as follows: "We have come up with basically two facts that we can agree upon and then there are essentially two other issues that relate to disputed facts, if you will. [¶] First of all, we agree that she was terminated on August 8, and we also agree that after August 8 she took no administrative . . . steps to do anything. . . . [¶] Beyond that, the disputed issues relate to her conduct prior to August 8 and whether or not that fulfilled the requirements of the M.O.U.; and, secondly, the issue of futility, which the plaintiff is prepared at whatever point to discuss the evidence in terms of why . . . that to do anything after August 8 would have been futile." Mokler's counsel informed the court he had "other evidence" supporting the futility exception to exhaustion. The court, however, concluded the futility exception did not apply to Mokler's breach of contract claim, regardless of any facts Mokler might present.[4] The court granted judgment on the pleadings as to Mokler's claims for breach of contract and wrongful termination. Accordingly, Mokler never received a full opportunity to present evidence

---

[4] On this point, the following colloquy occurred between the court and Mokler's counsel: "Mr. Card: Along with the issue of futility in terms of whether or not, based upon other evidence, whether it would have been futile for her to have gone back to Vicki Landrus after Vicki Landrus signed—[¶] The Court: I'm going to make that easy for you. For the purposes of my action, whether or not the plaintiff subjectively or objectively thought that taking required steps would be a futile step, I'm not going to find it's a sufficient basis to excuse the step."

supporting her contention that exhaustion would have been futile. We therefore reject the County's contention that it preserved its exhaustion defense as to Mokler's retaliation claim.

B. *Substantial Evidence Supports Mokler's Retaliation Claim*

1. *Mokler Established a Prima Facie Case for Retaliation*

■ Labor Code section 1102.5, subdivision (b), provides that an "employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." A retaliation claim may be proved in two different ways.

First, a plaintiff may prove retaliation by circumstantial evidence. In these cases, the plaintiff is required to first establish a prima facie case of retaliation. Once established, the defendant must counter with evidence of a legitimate, nonretaliatory explanation for its acts. If the defendant meets this requirement, the plaintiff must then show the explanation is merely a pretext for retaliation. (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 [37 Cal.Rptr.3d 113] (*Patten*); see also *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453 [116 Cal.Rptr.2d 602].)

Second, retaliation may be proved by direct evidence. "Where a plaintiff offers direct evidence of discrimination that is believed by the trier of fact, the defendant can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the unlawful factor." (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67–68 [105 Cal.Rptr.2d 652] (*Morgan*).) Where direct evidence of retaliation is shown, the burden shifting analysis imposed in circumstantial evidence cases does not apply. (*Id.* at p. 68.)

■ To establish a prima facie case of retaliation "a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." (*Patten, supra,* 134 Cal.App.4th at p. 1384.) An employee engages in protected activity when she discloses to a governmental agency " 'reasonably based suspicions' of illegal activity." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 86–87 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) The County contends Mokler failed to establish a prima facie case of retaliation because she had no reasonable basis to suspect an internal and temporary reporting change within the County violated state or federal law. We disagree.

In support of her initial burden, Mokler relies on the following testimony to show she held a reasonable belief the County engaged in illegal activity: (1) Mokler's own testimony; (2) the testimony of Ed Long; (3) the testimony of Frederick Branca; and (4) the testimony of William Baker.

Mokler testified: "Based upon our contract with the California Department of Aging, the County could not effectuate any reorganization of the office on aging without getting prior approval from the state Department of Aging." Mokler further testified that requiring Teeter to report only to Rawlings "significantly" changed the operational structure of the OoA and in her view violated federal and state law. Mokler also testified that her supervisors told her not to tell the state about the organizational change.

Long confirmed that "reorganization of the area agency on aging does have to be approved by the Department of Aging," and that the contract between the County and the state may be terminated if a material change in the organization occurs. Long expressed his belief that a material change meant a change in the placement of the OoA within the County. Long had no opinion, however, on whether the reorganization at the OoA represented a sufficiently material change to require state approval.

Branca, the former chief financial officer in the County executive office, expressed his opinion that a change in reporting would constitute a material reorganization, but later clarified that the change would be material only if Teeter and the contracts staff also physically moved out of the OoA. Branca testified that this did not occur.

Baker, Mokler's former supervisor, testified about a conversation he had with Mokler after she had learned of the reporting change in the contracts department: "Q: [W]hat do you remember about the conversation? [¶] . . . [¶] [A:] Basically that the contracting function was being reassigned. [¶] Q: . . . Did you indicate to her when she told you that that you thought that was a violation of law? [¶] . . . [¶] [A:] I believed that to the—to my knowledge, to what my belief was, that it was not—not appropriate or legal. [¶] Q: . . . And that's based upon the Older Americans Act or the Older Californians Act? [¶] A: Yes."

We conclude substantial evidence supports a finding that Mokler reasonably believed the change in the reporting requirements of OoA's contracts department represented a material change requiring state approval. In particular, the jury could have determined that Mokler reasonably relied on Baker's opinion since he had been her former supervisor, thereby justifying her belief the County's proposed action was illegal. The jury also could infer Mokler's supervisors also believed the change was illegal because they instructed her

not to inform state officials of the new reporting requirements. We therefore conclude Mokler met her burden of demonstrating a prima facie case of retaliation.

### 2. *Substantial Evidence Supports Pretext*

Once an employee establishes a prima facie case of retaliation, the burden shifts to the employer "to offer a legitimate, nondiscriminatory reason for the adverse employment action." (*Morgan, supra*, 88 Cal.App.4th at p. 68.) The County met this requirement by presenting evidence of three independent investigations concluding Mokler breached County procurement procedures with respect to the LCF proposal and the restrictive van IFB that effectively excluded all bidders except Mokler's favored vendor.

Once the employer meets its burden, the burden then shifts back to the plaintiff to prove the employer's proffered reasons for termination are pretextual. (See *Morgan, supra*, 88 Cal.App.4th at p. 68.) " '[T]he plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." ' " (*Id.* at p. 68.)

Evidence supporting pretext included the fact Mokler had never been reprimanded or received a negative performance review during her County employment before she complained about the accounting department reassignment. Indeed, her two annual performance reviews rated her overall performance as "exceptional." Approximately one month before the County suspended her, Mokler's supervisor, Baker, effusively praised her job performance in a recommendation letter he wrote for her, noting: "[Mokler] has delivered on that charge [to build a top-flight organization] and done so in a manner which has astounded me. With an unwavering quest to serv[e] seniors and seemingly unbounded energy, [Mokler] and her team have not only made the OoA a force for seniors, *but have made strong in-roads in forging collaborative efforts, especially among the Asian and Latino community leadership on behalf of their senior population.*" (Italics added.)

Ironically, Mokler's close relationship and collaboration with the LCF, so highly valued by Baker, was noted repeatedly as a negative factor in the intent to terminate letter sent to Mokler. For example, in criticizing Mokler's handling of the LCF proposal for use of the one-time funds, the letter condemns her collaboration with the group and failure to maintain an "arms length" relationship. The letter expresses the view that her *"relationship with the Latino Coalition [is] a cause for mistrust and suspicion . . . ."* (Italics added.) Similarly, the letter's discussion of the Mission Hospital van proposal begins with the following statement: *"Your relationship with the Latino*

*Coalition* also cast strong doubt on the impartiality of another contract process, the Diabetic Outreach Van Invitation for Bid (IFB)." (Italics added.) The letter also cites with suspicion the group's arrangement of Mokler's meeting with the President of the United States, and her dinner with several LCF members while in Washington, D.C.

Thus, the record demonstrates that Mokler's close relationship with Latino outreach groups earned her high praise from her supervisor just weeks before she complained about the contract group's reassignment, and then became a partial basis for her termination shortly thereafter. A jury could reasonably infer from the County's sudden change of position that the County's professed reasons for termination were pretextual. (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1062 [32 Cal.Rptr.3d 436, 116 P.3d 1123] [recognizing evidence of material change in performance reviews after protected activity is probative of pretext].)

Pretext also is supported by evidence that, until the time of her discharge on July 3, no one in the County ever told Mokler that she had done anything irregular in connection with the outreach van, one of the two key grounds for her termination. Moreover, Mokler testified she attempted to find competitors rather than "sole source" the IFB, as charged in the intent to terminate letter. Similarly, De Posada, president of LCF, testified consistently with Mokler that the OoA never rewrote the LCF's proposal as alleged in the termination letter, but simply recommended issues for LCF to address. Thus, the jury reasonably could infer the County's allegations constituted a trumped-up effort to justify their retaliatory termination of Mokler.

C. *Norby's Improper Conduct Toward Mokler Failed to Demonstrate Sufficiently Severe or Pervasive Acts to Establish a Hostile Work Environment Claim*

 FEHA prohibits an employer from sexually harassing an employee and discriminating against an employee in compensation, terms, conditions, or privileges of employment because of sex. (Gov. Code, § 12940, subds. (a), (j)(1).) Courts have recognized two theories of actionable sexual harassment under FEHA. " 'The first is quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances. The second is hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment.' " (*Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 149 [124 Cal.Rptr.2d 1].) Mokler's allegations against Norby pertain only to the creation of a hostile work environment.

 In evaluating hostile work environment claims, California looks to both our own state cases and federal authority under title VII of the Civil

Rights Act of 1964. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130 [87 Cal.Rptr.2d 132, 980 P.2d 846].) To be actionable, the sexual harassment must be sufficiently severe or pervasive " ' "to alter the conditions of [the victim's] employment and create an abusive working environment." ' " (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609 [262 Cal.Rptr. 842] (*Fisher*).) "Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. [Citation.] The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's [fn. omitted] work performance and would have seriously affected the psychological well-being of a reasonable employee and that she was actually offended." (*Id.* at pp. 609–610.)

"The factors that can be considered in evaluating the totality of the circumstances are: (1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurs; and (4) the context in which the sexually harassing conduct occurred. [Citation.] [¶] In determining what constitutes 'sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature. [Citation.] [¶] '[W]hile an employee need not prove tangible job detriment to establish a sexual harassment claim, the absence of such detriment requires a commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment.' [Citation.]" (*Fisher, supra,* 214 Cal.App.3d at p. 610.) "The required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.' [Citation.] '[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' [Citation.]" (*Nichols v. Azteca Rest. Enters., Inc.* (9th Cir. 2001) 256 F.3d 864, 872.)

Thus, " '[c]ourts have concluded that a hostile work environment existed where there was a pattern of continuous, pervasive harassment. (See e.g., *Meritor Savings Bank* v. *Vinson* [(1986)] 477 U.S. [57], 60 [91 L.Ed.2d 49, 106 S.Ct. 2399] [The plaintiff had agreed to 40 or 50 acts of intercourse with her supervisor after repeated demands for sexual favors. The supervisor also "fondled her in front of other employees, followed her into the women's restroom when she went there alone, exposed himself to her, and even forcibly raped her on several occasions."]; *Hall* v. *Gus Const. Co., Inc.* (8th Cir. 1988) 842 F.2d 1010, 1012 [constant verbal abuse, requests for sexual relations, unwanted touching directed to female traffic controllers at construction site and urinating in plaintiffs' water bottles and gas tank.]; *Broderick* v.

*Ruder* [(D.D.C. 1988)] 685 F.Supp. 1269, 1277–78 [Plaintiff, who was sexually harassed by several male supervisors, showed pervasive nature of conduct by establishing that employer afforded preferential treatment to female employees who submitted to sexual advances or other sexual conduct and such conduct was a matter of common knowledge.]; *Yates* v. *Avco Corp.* (6th Cir. 1987) 819 F.2d 630, 632 [supervisors' constant rude comments to and requests for sexual favors from plaintiffs]; *Katz* v. *Dole* (4th Cir. 1983) 709 F.2d 251, 254 [coworkers' systematic infliction of extremely vulgar and offensive sexual slurs and insults to a female air traffic controller]; *Henson* v. *City of Dundee* [(11th Cir. 1982)] 682 F.2d 897 [police chief's numerous harangues and demeaning sexual inquiries and vulgarities as well as repeated requests that plaintiff have sexual relations with him]; *Bundy* v. *Jackson* [(D.C. Cir. 1981)] 205 U.S. App.D.C. 444 [641 F.2d 934, 940, 943] [Sexually stereotyped insults such as " 'any man in his right mind would want to rape you' " and propositions directed to plaintiff by her supervisors over a two-year period amounted to the "standard operating procedure" of the agency.].)' " (*Guthrey* v. *State of California* (1998) 63 Cal.App.4th 1108, 1123 [75 Cal.Rptr.2d 27] (*Guthrey*).)

" 'On the other hand, courts have concluded that isolated instances of sexual harassment do not constitute a hostile work environment. (See, e.g., *Jones* v. *Flagship Intern.* [(5th Cir. 1986)] 793 F.2d 714, 716 [supervisor's two suggestive remarks and a single proposition of plaintiff]; *Rabidue* v. *Osceola Refining Co.* (6th Cir. 1986) 805 F.2d 611, 615, 622 [Even though coworker was extremely vulgar and crude and in confrontation posture with plaintiff and nude photos were present, totality of the workplace was not affected.]; *Scott* v. *Sears, Roebuck & Co.* (7th Cir. 1986) 798 F.2d 210, 214 [isolated winks, suggestive remarks and a coworker's single request for a date with plaintiff]; *Downes* v. *F.A.A.* [(Fed. Cir. 1985)] 775 F.2d 288, 293 [Defendant engaged in mildly offensive verbal conduct on three occasions and twice touched plaintiff's hair.].)' " (*Guthrey, supra*, 63 Cal.App.4th at pp. 1123–1124.)

The point at which incidents of sexual harassment become actionable is illustrated in *Sheffield* v. *Los Angeles County Dept. of Social Services* (2003) 109 Cal.App.4th 153 [134 Cal.Rptr.2d 492] (*Sheffield.*) There, Thompson, a female county employee, attempted to pursue a romantic relationship with the plaintiff, a heterosexual female coworker. The first incident occurred when Thompson called the plaintiff at her home, telling the plaintiff she liked her " 'like a man likes a woman.' " (*Id.* at p. 157.) Feeling uncomfortable, the plaintiff rejected Thompson's advance, and hung up the phone. The next day, Thompson called the plaintiff at her workstation repeatedly, again asking the plaintiff to meet her, and plaintiff again declined. As Thompson's calls continued, the plaintiff arranged for someone else to answer her phone. Feeling frightened by her small frame compared to the larger Thompson, the

plaintiff sought help from her supervisor and put a block on her home phone. Two days later, while walking to a college class, the plaintiff heard Thompson angrily calling her name. Frightened by Thompson's size and tone of voice, the plaintiff took off running to avoid her. The next day at work, Thompson made a threatening gesture, slamming her fist into the palm of her hand as she walked by the plaintiff. Two days later, Thompson physically attacked the plaintiff at work. The county then terminated Thompson's employment.

After the plaintiff sued the county, the trial court granted the county's summary judgment motion, determining the incidents did not amount to a hostile work environment. The Court of Appeal in *Sheffield* reversed, explaining that the "FEHA's prohibitions are not a 'civility code' and are not designed to rid the workplace of vulgarity. [Citations.] To be actionable, the conduct must be extreme, but there is no requirement that the employee endure sexual harassment until his or her psychological well-being is so spent that the employee requires psychiatric assistance. [Citation.]" (*Sheffield, supra*, 109 Cal.App.4th at pp. 161–162.) The court acknowledged the brief amount of time Thompson's harassment persisted, but found the case "unique" because of the threat of violence when Thompson slammed her fist into her hand. "Until this incident Thompson's actions had amounted to boorish or overbearing behavior. The slamming the fist into the palm added an aspect of violence that could be found to have changed the conditions of Appellant's employment." (*Id.* at p. 163.)

Here, we note Norby's harassment of Mokler occurred on three occasions over a five-week period, and involved no physical threats. The first occurred on January 29, 2003, at an offsite budget meeting. During the lunch break, Mokler approached Norby and introduced herself. Norby asked about her marital status and called her an "aging nun" when he learned she was not married.

The second occurred on February 5, 2003, at a hotel celebration. There, Norby took Mokler by the arm, pulled her to his body, and asked, "Did you come here to lobby me?" When she answered no, Norby, responded: "Why not? These women are lobbying me." He told Mokler she had a nice suit and nice legs, and looked up and down at her.

The third occurred on March 3, 2003, at Norby's office. Norby told Mokler she looked nice and put his arm around her. He then asked Mokler where she lived, demanding to know her exact address. Norby again put his arm around Mokler and, as he did so, his arm rubbed against her breast. When Mokler tried discussing the services provided by the OoA, Norby interrupted, stating: "Why the "f[uck]" do you have to do something special for Mexicans?"

 Following established precedent, we conclude these acts of harassment fall short of establishing "a pattern of continuous, pervasive harassment" (*Fisher, supra*, 214 Cal.App.3d at p. 611), necessary to show a hostile working environment under FEHA. Norby did not supervise Mokler or work in the same building with her. The first incident involved no touching or sexual remarks; rather, Norby uttered an isolated but boorish comment on Mokler's marital status. The second incident did not occur at work, and involved a minor suggestive remark and nonsexual touching. The third incident involved touching when Norby placed his arm around Mokler and rubbed his arm against her breast in the process. The touching, however, was brief and did not constitute an extreme act of harassment. Norby's request for Mokler's home address was brazen, but this conduct falls short of what the law requires to establish a hostile work environment. Norby's derogatory statement regarding Mexicans was unmistakably foul and offensive, but not sexual.

Taken as a whole, the foregoing acts demonstrate rude, inappropriate, and offensive behavior. To be actionable, however, a workplace must be " 'permeated with "discriminatory intimidation, ridicule and insult," [citation] that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ' " (*Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 517 [76 Cal.Rptr.2d 547] (*Beyda*).) The acts Mokler has alleged here are similar in scope to those found insufficient to constitute a hostile work environment in other cases. (See, e.g., *Quinn v. Green Tree Credit Corp.* (2d Cir. 1998) 159 F.3d 759, 768 [harasser's statement that plaintiff had been voted the " 'sleekest ass' " in the office and single deliberate act of touching plaintiff's breasts with papers he was holding in his hand held insufficient]; *Weiss v. Coca-Cola Bottling Co. of Chicago* (7th Cir. 1993) 990 F.2d 333, 337 [insufficient where supervisor told plaintiff how beautiful she was, repeatedly asked her out, tried to kiss her on three separate occasions, put " 'I love you' " signs on her work area, and touched her shoulder at least six times]; *Chamberlin v. 101 Realty, Inc.* (1st Cir. 1990) 915 F.2d 777, 783 [five sexually motivated advances on plaintiff over a four- or five-week period held insufficient for hostile work environment].)

While we do not condone Norby's improper behavior, Mokler failed to present sufficient evidence of acts " ' "sufficiently severe or pervasive to alter

the conditions of [her] employment and create an abusive working environment." ' " (*Beyda, supra,* 65 Cal.App.4th at p. 517.) We therefore reverse that portion of the trial court's order denying JNOV on Mokler's FEHA claim for sexual harassment.

## D. *Sufficient Evidence Supports the New Trial Order*

Mokler contends insufficient evidence supports the new trial order. We disagree.

Code of Civil Procedure section 657 provides: "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."

■ The considerable deference Code of Civil Procedure section 657 affords the jury when a trial judge is considering a new trial motion is exceeded only by the deference afforded the trial judge when the appellate court reviews an order granting a new trial. Indeed, an order granting a new trial " '*must* be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' " (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412 [93 Cal.Rptr.2d 60, 993 P.2d 388], italics added.) In other words, "[t]he determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681].)

■ Orders granting new trials on the ground of excessive damages must be accompanied by a written specification of reasons prepared and filed by the trial judge. " '[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence to justify the verdict . . . it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons.' " (*Jones v. Citrus Motors Ontario, Inc.* (1973) 8 Cal.3d 706, 710 [106 Cal.Rptr. 28, 505 P.2d 220]; see *Thompson v. Friendly Hills Regional Medical Center* (1999) 71 Cal.App.4th 544, 549 [84 Cal.Rptr.2d 51].) "No hard and fast rule can be laid down as to the content of such a specification, and it will necessarily vary according to the facts and circumstances of each case." (*Mercer v. Perez* (1968) 68 Cal.2d 104, 115 [65 Cal.Rptr. 315, 436 P.2d 315].) Nonetheless, a specification of

reasons phrased in terms of " 'the issues' " or the " 'ultimate facts' " is not sufficient to comply with Code of Civil Procedure section 657. (*Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 367, 369–370 [90 Cal.Rptr. 592, 475 P.2d 864].)

Here, following trial, the jury awarded Mokler $1,681,823 in past and future noneconomic damages. The trial court, after rejecting other grounds for a new trial, granted a new trial motion on the grounds of excessive damages, conditioned upon Mokler rejecting a remitted damage amount of $125,000. The new trial order applied only to the County, and granted a new trial on damages only.

The court's statement of reasons provides: "After weighing this entire record, including reasonable inferences, the Court finds that as to the County of Orange only, [¶] (1) there were no damages due for the harassment, [¶] (2) no physical pain and suffering, requiring medical or professional attention, [¶] (3) no evidence as to loss of reputation, [¶] (4) no evidence plaintiff had trouble finding a new job, [¶] (5) no evidence the public scorned plaintiff, [¶] (6) no evidence of any future damages or injury. [¶] Therefore, the non-economic damages herein in the amount of $1.6 million were excessive. Although the jury may not have intended to 'punish' the County, that is what such an inflated award represents. The Court therefore exercises its duty to set aside the verdict pursuant to its independent appraisal of the evidence. [Citations.] [¶] The motion is granted unless the plaintiff agrees to accept $125,000.00."

The evidence Mokler cites in challenging the new trial order does not demonstrate that any of the six items noted by the court were either unsupported or contradicted by the evidence at trial. The jury's failure to award damages for harassment meant all of the damages flowed from the retaliatory termination. Although Mokler testified she felt threatened and humiliated by the County's actions surrounding her termination, she did not require medical or professional attention. True, Mokler did introduce evidence of her positive reputation in her field, but the evidence did not show the County damaged her reputation in any way, or that she was scorned or ridiculed by the public. Indeed, that Mokler was unemployed for only two weeks suggests Mokler's reputation remained unimpaired. Moreover, because she was hired so quickly, Mokler did not have to suffer the economic worries which typically exacerbate the emotional distress suffered by wrongfully terminated individuals unable to find comparable employment. Because the trial court's reasons are supported by substantial evidence, we affirm the new trial order.

IV

DISPOSITION

The trial court's order denying the County's motion for judgment notwithstanding the verdict is reversed as to Mokler's cause of action for sexual harassment, and the trial court is instructed to grant the motion as to that cause of action. The order in all other respects is affirmed. The trial court's order conditionally granting a new trial as to damages only is affirmed. In the interests of justice, each party is to bear its own costs in this appeal.

O'Leary, Acting P. J., and Ikola, J., concurred.