Filed 11/19/20  Young v. County of Los Angeles CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LORNA YOUNG, | B294386 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC609911) |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard E. Rico, Judge.  Reversed.

Law Offices of Angel J. Horacek, Angel James Horacek, Barbara DuVan-Clarke, for Plaintiff and Appellant.

Martin & Martin, Rachel D. Salvin, for Defendants and Respondents.

Plaintiff and appellant Lorna Young appeals from a judgment of dismissal following orders granting a demurrer and a motion for summary adjudication in favor of defendants and respondents Department of Public Social Services (DPSS) and the County of Los Angeles (collectively the County) in this action alleging retaliation for engaging in protected activity.  On appeal, Young contends:  (1) the complaint stated a cause of action for retaliation in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) following Young's complaints about discrimination based on race, and (2) triable issues of fact exist as to her cause of action for retaliation in violation of Labor Code section 1102.5, following her whistleblower activities.  We hold that the allegations of the complaint, in conjunction with the evidence judicially noticed, state a cause of action for retaliation in violation of the FEHA.  In addition, triable issues of fact exist as to whether the County retaliated against Young in violation of Labor Code section 1102.5.  Therefore, we reverse.

# FACTS AND PROCEDURAL BACKGROUND[1]

## Allegations of the Complaint

Young filed the operative third amended complaint against the County on September 20, 2016, alleging several causes of action, including retaliation in violation of FEHA and retaliation in violation of Labor Code section 1102.5, as follows.

DPSS hired Young in 1995 as a clerk. In 2006, Young became a union shop steward for SEIU Local 721. DPSS promoted Young to Eligibility Worker III in 2007. She worked at the DPSS facility on South Vermont Avenue (the Vermont facility), which was two miles from her home.

Brian Nollner, who was the district director at the Vermont facility, divided DPSS employees at the Vermont facility into a group of Latinx employees serving Latinx customers and a group of Black employees serving Black customers. DPSS employees, including Young, complained to Nollner that his division of the employees constituted race discrimination, fomented hostility in the workplace, and unfairly distributed more work to Black employees. On March 15, 2012, Nollner agreed the work had been segregated and said he intended to reorganize the distribution of work. However, Irene Huizar replaced

---

[1] The County's request for judicial notice of pleadings filed in the trial court proceedings filed with this court on March 17, 2020, is granted.

3

Nollner as the district director for the Vermont facility on April 16, 2012.  In a labor management meeting in May 2012, Huizar stated that she had decided to keep the segregated work assignments.

Between May 2012 and August 2013, Young reported the racially segregated work assignments to the Los Angeles County Board of Supervisors (the Board), Senator Dianne Feinstein, the director of DPSS, and the International President of SEIU Local 721.  She raised the issue in monthly steward council meetings as well.

On September 17, 2013, Young conducted a "Bad Boss Campaign" for SEIU Local 721 in order for DPSS employees and union members to present Huizar with a list of violations of workers' rights.  Huizar refused to allow the group to present the petition to her.  Huizar attempted to keep her door closed and was struck by a door handle.  Huizar reported Young as the person who injured her, although it was not Young.

The following day, Young met with Division Chief Stephanie Dillard and the director of a different facility named Carol Maston.  Young received a verbal suspension without pay for 30 days.  While she was at home during the suspension, DPSS told her that she would be returning to work at a different location.

Young contacted the union for assistance and was ultimately directed to report for work at a DPSS facility on South Central Avenue (the Central facility).  When she went to the Vermont facility to collect her personal effects, she

was escorted by security, sheriff's deputies, and DPSS administrative deputies. She reported to the Central facility on October 24, 2013.

Her first, second, and third level supervisors at the Central facility were Latinx. Her supervisors were aware of her complaints about segregated work assignments at the Vermont facility. Because of this, her supervisors treated Young differently from similarly situated employees, made it difficult for her to perform her job, and created an inhospitable work environment.

On the day that she arrived, she was provided with a work station directly beneath air conditioning vents. Young complained about the cold and the seat provided. Although there were other work stations available, her supervisors refused to relocate her. Other DPSS employees had workstations to facilitate their job functions, but Young's workstation was never set up to facilitate her job function. She was not provided the security clearance within the computer system that she needed to perform the job that she had been assigned.

Following her return to work in October 2013, she asked to take leave under the Family and Medical Leave Act of 1993 (FMLA) (29 U.S.C. § 2601 et seq.), because her father was gravely ill. DPSS concluded that she did not have the time accumulated to be eligible for leave under the FMLA and denied her request for leave. Young filed a complaint with the United States Equal Employment Opportunity Commission (EEOC) in October 2013. Her father died on

5

November 5, 2013.  Young also developed bronchitis in November 2013.

Young's supervisor blamed her for a four-month file backlog, although Young had recently started and did not have the computer clearance necessary for her job function. In March 2014, Young's doctor issued a note with a work restriction limiting her to a three-day work week as a result of work-related stress.  Despite being aware of her work-related stress, DPSS continued to marginalize her, failed to provide her with appropriate responsibilities, and refused to move her work location from under the air conditioning vent. Young felt she was minimized, targeted for extra scrutiny that other employees did not receive, and subjected to excess discipline to which other employees were not subjected.  As a result, she felt she could not stay in such an environment and was constructively terminated on August 29, 2014.

On February 27, 2015, Young filed a second complaint with the EEOC, as well as a complaint with the Department of Fair Employment and Housing (DFEH).  Both entities issued right-to-sue letters.  On August 14, 2015, Young's attorney requested Young's personnel records from DPSS. On August 17, 2015, Young requested reinstatement.  On September 25, 2015, DPSS denied her reinstatement request.

On September 30, 2015, Young received a text message from a DPSS employee who was in a meeting with Huizar. The employee reported that Huizar had cautioned employees to be careful with union activities or "you may find yourself

not able to promote or without a job." The employee understood Huizar to be referring to Young. DPSS produced Young's personnel documents on October 2, 2015, after the statutory deadline.

On February 11, 2016, Young filed the instant lawsuit against DPSS and the County. She filed amended complaints in February and April, 2016. On September 20, 2016, Young filed a third complaint with the DFEH, obtained a right to sue notice, and exhausted her administrative remedies. The following day, she filed the operative third amended complaint.

In connection with the cause of action for retaliation in violation of the FEHA, Young further alleged that she complained of racial discrimination in the workplace, engaged in equal employment opportunity (EEO) activity, and requested family medical leave to care for her father under the California Family Rights Act (Gov. Code, § 12945.2). Following her complaint and the EEO activity, DPSS took adverse employment actions against her, including assigning her to a job location farther away, failing to provide a security clearance for her to perform her job, requiring her to sit under an air conditioning vent, denying leave to care for her father, constructively terminating her, failing to reinstate her, and failing to timely produce her personnel file. Her complaints of racial discrimination, EEO activity, and her request for family medical leave were substantial motivating reasons for the decisions of DPSS to

engage in the adverse employment actions, and the conduct of DPSS was a substantial factor in causing Young harm.

With respect to the cause of action for violation of Labor Code section 1102.5, she further alleged that she had disclosed information regarding racial discrimination to a government agency and to a person with authority over her, who had the power to investigate and correct the violation, by complaining to her immediate superiors and by filing an EEOC complaint regarding the racial discrimination.  Her disclosure of this information was a substantial motivating reason for DPSS and the County to take adverse employment actions against her, by which she was harmed.  As a direct result, Young suffered economic and non-economic damages, including a loss of earnings and other employment benefits and job opportunities.

## Demurrer to Third Amended Complaint

On October 20, 2016, the County filed a demurrer to several of the causes of action, including the cause of action for retaliation in violation of the FEHA.  The County argued that the retaliation allegations stemmed from her complaints about discrimination at the Vermont facility, which she had left more than a year prior to filing charges with the EEOC and the DFEH.  The adverse employment actions at the Vermont facility were equally stale.  Therefore, her claims based on actions at the Vermont facility were time barred.  There was no nexus between the

8

protected activity at the Vermont facility and purported adverse employment actions at the Central facility, and her claims based on post-resignation conduct failed for lack of certainty.

The County requested that the trial court take judicial notice of the complaint that Young filed with the DFEH on February 27, 2015. Young checked boxes for discrimination based on race and retaliation. In the box for the particulars of the charge, Young stated in pertinent part: "On October 1, 2014, I was subjected to a difference in treatment which included but was not limited to: being involuntarily moved to another district. On or about February 1, 2015, the County failed to replace time taken as a result of FMLA. [¶] No reasons were given . . . for the difference in treatment. [¶] I believe that I have been discriminated against due to my race, Black[,] and in retaliation for opposing an unlawful activity, which is in violation of Title VII of the Civil Rights Act of 1964, as amended." It is clear that Young misstated the dates of the adverse employment actions listed, because the County moved her to a different district in October 2013, and the failure to replace time taken for leave purposes would have occurred prior to Young's separation from employment in 2014.

Young opposed the demurrer to the cause of action for retaliation in violation of FEHA on the ground that the allegations were sufficient to state a cause of action, namely that the County engaged in adverse actions against her which culminated in the failure to reinstate her employment

9

and produce personnel documents, and she timely exhausted her administrative remedies. The County filed a reply arguing that the February 2015 charge filed with DFEH was untimely and could not be revived through the September 2016 charge.

A hearing was held on April 24, 2017. No reporter's transcript of the hearing has been made part of the record on appeal. The trial court took judicial notice of the February 2015 DFEH charge and sustained the demurrer without leave to amend. The court noted Young had not alleged any discrimination based on race at the Central facility, so the last date of discrimination was in October 2013 and her DFEH charge filed more than a year later was untimely. The trial court concluded any retaliation claim that rested on the discrimination claim was untimely as to pre-termination allegations. Young's allegations about actions taken post-termination were not sufficient to revive her discrimination, harassment, or retaliation claims. In addition, the County's failure to provide personnel information might support a Labor Code violation, but would not support or reinstate claims under the FEHA.

## Motion for Summary Adjudication and Supporting Evidence

On June 15, 2018, the County filed a motion for summary adjudication of several causes of action, including the cause of action for retaliation against a whistleblower in

violation of Labor Code section 1102.5. The County argued that there was no causal connection between Young's complaints about segregated work units in 2012 and the denial of her request for reinstatement in August 2015, because there was no evidence that the disclosure of the information was a contributing factor in the adverse employment action. There was no temporal proximity between the whistleblowing activities and the denial of reinstatement, and no evidence of retaliatory animus. In addition, the County had a plausible non-retaliatory reason for denial of the reinstatement request based on Young's disciplinary history.

The County submitted a letter dated March 11, 2015, from an attorney representing Young, presenting a claim pursuant to the Government Claims Act. The claim was made against the County and several individual employees. The date of the occurrence giving rise to the claim was stated as September 17, 2013, to the present. The general description of the injury was false accusation, intentional infliction of emotional distress, violations of FEHA and the Civil Rights Act, and conspiracy to commit intentional torts.

The attorney requested that the County produce Young's personnel records within 21 days. He summarized the facts of Young's claim as a false accusation by Huizar on September 17, 2013, followed by suspensions and a year of harassment, retaliation and hostile work environment, which led to Young's constructive termination on August 29, 2014. The attorney requested immediate reinstatement with

back pay in an environment free of harassment, retaliation, and hostility, and stated that Young was revoking her previous resignation.

The County submitted the declaration of the human resources employee responsible for responding to the request for Young's personnel records. The employee alerted Young's attorney when the files were ready for pick up on April 9, 2015, and she believes the attorney picked up the files on April 16, 2015, when he left a business card. In August 2015, the County received a second request for Young's personnel file from a different attorney. Although the County was not obligated under the Labor Code to produce a second copy, the County provided a duplicate copy as a courtesy on October 2, 2015.

The County submitted the declaration of June Spizer, who is a third-level administrative services manager in the human resources department for DPSS. She explained that Lucia Chavez, who is a first-level manager in human resources, initiated the background check for Young's reinstatement request by preparing a "two-way lettergram" that was circulated to other departments. Chavez has no decision making authority. Patricia Bradley is a second-level manager in human resources who reports to Spizer.

Spizer makes the final decision on requests for reinstatement, but typically follows the recommendation that is made based on the background check. The recommendation made after Young's background check was to reject the request, and the explanation provided was

"Candidate prior work history not suitable to hire at DPSS." Spizer followed the recommendation and denied the reinstatement request. She directed Bradley to notify Young. Spizer has never met Young and is not familiar with anything related to her employment with the County. She has never personally reviewed the contents of Young's personnel file.

The County also submitted the declaration of Reyna Castaneda. At the time that Young applied for reinstatement, Castaneda was a management analyst in the discipline, policy, litigation, and LiveScan section of DPSS. She was responsible for conducting background checks for new hires, transfers, reinstatements, and promotions at DPSS. Castaneda conducted the background investigation for Young's reinstatement request. She was not previously aware of Young and was not familiar with Young's employment history before being asked to conduct the background investigation. Castaneda's practice was to prepare a summary and make a recommendation for review by her supervisor, Arnetta Counts. If Counts agreed with the recommendation, she would sign the summary and return it to Castaneda.

Castaneda found Young had a substantiated case against her from Internal Affairs for organizing a "Bad Boss Campaign" against the director of the Vermont facility, which had resulted in a confirmation of conference being issued on May 15, 2014. Young was the "Involved Party" in three cases before the County Equity Oversight Panel

(CEOP), one of which was substantiated on January 22, 2015, after Young had resigned her employment. She received a five-day suspension on January 5, 2011, for failing to follow established rules. She had unauthorized absences without pay (UAWOP) totaling 17 hours between September 1, 2012, and August 29, 2014. Each of these incidents alone would have been enough to recommend denial of reinstatement.

The County submitted the declaration of Counts as well. Counts became familiar with Young in September 2013, when Young was involved in the union-sponsored campaign involving Young's supervisor, Huizar. Counts was responsible for assessing the scope of Young's involvement in the campaign and determining the appropriate discipline. In conjunction with Young's suspension after the campaign and her Skelly hearing related to the suspension, Counts reviewed affidavits and other information regarding the conduct of all the County and non-County people involved. As a result of her investigation, Counts determined that Young was a participant in the campaign, not an instigator. Counts recommended that Young be reassigned to a different facility, issued a non-disciplinary confirmation of conference, and receive full pay for the period of time that she was suspended pending investigation.

With respect to the reinstatement request, Counts did not have any specific memory of reviewing the results of the background check. She does not disagree with Castaneda's recommendation, however, to deny reinstatement based on

14

the results of the background investigation. Counts recommended the corrective action simply as a function of her job; she has no personal animosity toward Young and no reason to interfere with Young's attempts to seek reinstatement with the County.

## Opposition to Motion for Summary Adjudication and Supporting Evidence

Young opposed the motion for summary adjudication. She argued that the employees who denied her reinstatement request relied on retaliatory disciplinary acts for their decision, which was still retaliation, and they acted as the "cat's paw" in carrying out the County's retaliatory intent. The protected activities included reporting to her supervisors that DPSS had unlawfully segregated working groups by race and reporting her complaints to the Board when the County refused to hear her concerns. As a union steward, she engaged in union activities, and when the County suspended her without a Skelly hearing, she asked her union to assert an unfair labor practice against the County. She listed all of the adverse employment actions taken against her and the causal connection to her protected activities. She argued that the County had not met its burden to show a legitimate, non-retaliatory reason for the adverse employment actions taken against her, particularly because the County had addressed only the request for reinstatement. Also, the decision maker on her request for

reinstatement was merely the tool of other personnel who had discriminatory animus.

## A. Events in 2011 and 2012

Young submitted her declaration and excerpts of her deposition testimony to establish the following facts in opposition to the motion. In January 2011, Young went to a movie after a doctor's appointment and returned to work late. She was considered to have taken unauthorized leave without pay and suspended for five days.

Nollner created a unit of workers who were Latinx, not a unit of workers who spoke Spanish. The Latinx unit included both Spanish and non-Spanish speakers. Shortly after Huizar became the district director for the Vermont facility in April 2012, Huizar met with Young, another union shop steward named Deborah Polee, and four other employees. Huizar advised them that she had spoken with Nollner about desegregating the working groups and had met with the Spanish-speaking unit separately without union representation. She decided not to desegregate the district.

Although union bylaws and the memorandum of understanding required monthly labor management meetings, Huizar frequently said she could not attend and caused meetings to be delayed or cancelled. Office segregation was a continuing point of discussion at the union meetings.

Young submitted a July 2012 transcript that showed she addressed the Board to complain of workplace bullying and other issues. In August 2012, Young, Polee, and a third employee attended a Board meeting to complain about segregation in the Vermont facility. As they waited to speak, DPSS Director Sheryl Spiller approached and asked them to speak with her subordinates Phil Ansel and Anjetta Venters-Bowles instead, to give them an opportunity to address the issue. If the employees were not satisfied, Spiller said they should speak to her and she would handle their concerns directly. Venters-Bowles spoke with the trio at length in September 2012 and said she would look into the matter. Young provided updates to Spiller and DPSS Division Chief Stephanie Dillard through email messages that included the union agenda, union meeting dates, and the issue of the segregated work units.

## B. Events in September and October 2013

Young estimated approximately 30 people walked to Huizar's office on September 17, 2013, including four union representatives from outside the Vermont facility. The rights that Young and other employees asserted to Huizar included the ability to exercise their First Amendment rights without interference and to participate in union activity without retaliation or intimidation. Another right listed was not to undergo any abusive treatment by management,

17

which meant not to illegally take away time from employees and not to illegally suspend employees.

Young submitted several email messages in support of her opposition as well. On the afternoon of September 17, 2013, at 2:55 p.m., an employee relations representative notified Cathy O'Brien, who was the director of human resources, as follows: "Received a phone call from Southwest Family that Gilda Valdez, Michael Green and Yadira Villa of SEIU Local 721 were attempting to service Irene Huizar with the Bill of Rights. I contact[ed] John Garrisi [in the CEO's office] for instruction. [¶] Per John: Irene was to send her receptionist out and inform them that if they wish to service their Bill of Rights to go to Employee Relations which is located in Norwalk and service the document there. Spoke with Irene and she was fine with the instruction given to her. She would send her secretary to see them."

At 3:35 p.m., O'Brien responded and copied Dillard, Venters-Bowles, Huizar, and another employee: "The CEO directed SEIU to serve the Employee Relations staff. SEIU asking us to just 'take it' is unacceptable and hostile. This combative behavior toward our district office head is not acceptable. I am copying CEO for options such as an unfair and possibly CEOP since it applies to our employees who are shop stewards and they are harassing the director by using SEIU business agents."

At 3:41 p.m., Huizar responded, "This is to inform you that I am filing a police report for battery against Gilda. Gilda Valdez came to my door and push[ed] it against me,

hitting me with the door. She stepped into my office and proceeded to instruct [Young] to serve the Bill of Rights. [¶] I am also requesting for [Young] to be moved immediately as this behavior has escalated to a hostile work environment and I feel threatened because her behavior has become unpredictable."

Young submitted her own deposition testimony for the following facts. Young was verbally informed the next day that she had been suspended for 30 days without pay, and she received a letter of intent stating that she struck Huizar. The sole basis given to her for the suspension was the allegation that she struck Huizar. After receiving the suspension, she went to the union office to report what had happened. Polee was with her, because Young was hysterical. Young met with union representatives and the union attorney. While she was there her phone rang. A friend in the office said that all of the employees had been called into a mandatory staff meeting with Dillard, Venters-Bowles, and some human resource representatives, who advised employees not to participate in any union activity, otherwise they would end up like Lorna Young. Young relayed the information to the people in the union office.

The union attorney called O'Brien on Young's behalf. O'Brien said the County was not going to let an employee get away with assaulting a director, and that the whole activity was illegal. The union attorney disagreed, citing case law to support the activities.

19

Young provided copies of the following email messages as well. An email on September 18, 2013, from the union's attorney to O'Brien stated, "Steward Lorna Young received the attached after a workplace action. First, this is a ULP, as it is discipline for union activity. Second, the member was given no notice of intent or a Skelly. I have never seen the County so blatantly violate someone's constitutional rights." He requested an explanation.

The following day on September 19, 2013, Dillard sent an email to O'Brien and included Counts, Venters-Bowles, and two other employees. Dillard requested a review for disciplinary action for Young based on the events of September 17, 2013. "Young, other Southwest Family employees and SEIU Local 721 employees attempted to serve a Bill of Rights to District Director, Irene Huizar. During this event, there was an attempt to forcibly enter Ms. Huizar's office by SEIU representative Gilda Valdez and Ms. Young. This attempted entry result[ed] in an injury to Ms. Huizar's arm when her office door was pushed against her." Dillard attached the security incident report (SIR), an affidavit from a secretary at the Vermont facility, a photo of the Bill of Rights, and a photo of Huizar's arm taken on the day of the incident. She noted that Huizar independently filed a police report charging Valdez with assault. Dillard issued a verbal suspension to Young on September 18, 2013.

Counts responded, "Good stuff! Proceed with confirmation of Oral Suspension. You can also use this for the discipline letter."

O'Brien wrote to the union's attorney the following day on September 20, 2013, copying six individuals: "Ms. Young was responsible for instigating an illegal job action which led to the injury of a departmental employee. Ms. Young was told that this activity was unauthorized and specifically directed to 'serve' the Bill of Rights to DPSS Employee Relations Office and not to Ms. Huizar, Office Manager at her office. Ms. Young, along with SEIU professional staff people stormed the manager's office pushing the door open resulting in bodily injury to the manager who was trying to prevent them from entering her office. [¶] Najeeb, as you know there is a zero tolerance for work place violence which I am sure that you are supportive. It is unimaginable that you would support or condone such violence. We are going to treat this incident like any other incident of violence in the workplace and we will make no exception to this policy for Ms. Young or any of the other participants. A police report, a security incident report and a CEOP claim were filed. [¶] We can assure you that a full and complete investigation will be conducted including an interview with Ms. Young during the next 30 days to determine the facts of the situation. Ms. Young was directed to only speak with our Employee Relations staff during this time period. She should follow this directive."

On Wednesday, October 2, 2013, the union's attorney wrote, "Even the security incident report makes clear that Ms. Young did not engage in any violence. Isn't it time for the Department to undo this illegal act—we have already

21

filed a ULP and a civil service appeal and have the Skelly tomorrow (unconstitutionally being held after Ms. Young has already been suspended without pay)?"

On October 3, 2013, Counts sent an email to O'Brien, "I am proposing that after Young's Skelly meeting, we rescind our 18.01(a) suspension and restore her wages lost. This will make the Union's position to fight a moot point. [¶] Also, the documents I have seen thus far, do not show that Young was the instigator of the mob activity that occurred at Irene's office. What is stated in the affidavits and the SIR is that the Union's executive staff led, encouraged, and directed Young to participate in serving Irene the Bill of Rights via reciting the Bill's verbiage while Union folk pushed and held the door open. Irene has only asked that Young be disciplined, but her secretary named about four other office employees who were part of the mob. (I have asked Irene to provide more statements from the others involved. I also believe we need the statements from the Union staff that were the catalyst to this unsafe activity.) After we receive all other pertinent information, we can consider what additional discipline and/or corrective action must be taken to address the inappropriate behavior in the workplace by all involved. [¶] Please consider my suggestion and let me know how to proceed."

O'Brien responded later that morning, "There is still an investigation and still someone hurt that resulted from violence in the work place. [T]o conduct a fair investigation, we cannot have Ms[.] Young continuing to instigate MOB

activity in that office. [¶] Now, if SEIU presents information that the transfer precludes any further mob behavior, and shows SOME remorse for the harm they caused, then that should be considered by the Skelly officer. This Skelly is about safety and a fair investigation NOT a trier of fact since that information will only be available via an investigation that is not tempered with or influenced. [¶] We are NOT changing our course."

An employee named Elizabeth Garcia replied, "I concur. What causes me concern is 1) the Union clearly overstepped its' bounds in presuming it could plan and physically 'mob' management's office, 2) those in the planning and the physical should equally be held accountable and, 3) there seems to be no remorse. [¶] I am looking forward to what comes out of the Skelly."

Young submitted her deposition testimony to establish the following. On October 18, she was given a few hours to collect all of her things, while sheriff's deputies and security personnel monitored. She had worked at the location for 15 years and had three desks. When she had to use the bathroom while gathering her things, a sheriff's deputy was sent with her.

## C. Events after Transfer to the Central Facility

Young's first line supervisor at the Central facility was Veronica Vargas. When Young began working at the Central facility, Vargas said she was aware of the reason for

Young's transfer, but she did not want to get involved. Egberto De Leon was Young's second line supervisor. He commented, "No matter what happened over there, you're now here. So we are aware of what occurred, but now you're in another facility." They did not discuss his meaning, but Young considered his comment to be negative. Concepcion Buzo, the administrative director of the Central facility, was her third line supervisor. When Young started, Buzo made a comment similar to De Leon's that they knew why she had transferred. Each made one comment when she started and did not mention it again. Colin Neal was the director of the Central facility.

Vargas, De Leon, and Buzo made it difficult for Young to perform her work function by not having her work area set up. Young was stripped of all her security clearance, as if she just walked in the door as a new employee. Her email was erased, and she could not make case corrections, reverse payments, give credits, or make any of those type of adjustments. Young's computer was never set up with the security clearance that she needed to do the level of work that she had been assigned.

Young complained about a very cold vent that her work station was under. She was told to get a blanket and wear a coat. She had previously had surgery for carpal tunnel syndrome. She asked for ergonomic equipment and provided a prescription from her doctor, as she had done at the Vermont facility, but it was never set up.

She asked to take leave under the FMLA to care for her father. Neal told her that she did not have enough time accrued to be entitled to FMLA leave. Neal also notified her that she had caused the unit to have a backlog. Young's performance review at the Central facility was not less than satisfactory though.

A first line supervisor at the Central location warned Young to be careful, because it had been brought to the attention of staff that Young had been moved to Central because she assaulted a director. Young believed she followed the chain of command to report workplace bullying and other items, but her complaints were ignored. Instead, the lie that she assaulted a director and violated County policy was created and circulated to silence her.

After Young was transferred, she sent email messages to all concerned parties regarding retaliation, discrimination, and disparate treatment, including raising the complaint about her clearance. As a result of her email messages, Young met with Ansel in January or February of 2014 to discuss her suspension on September 17, 2013, and the false accusation that she had assaulted the director.

Young submitted an email that she wrote on May 7, 2014, to several people, including Buzo, Neal, Dillard, Spiller, and a union representative, with the subject line "Continued Unjust Treatment Due to 30day Suspension." She stated that the County's unjust treatment had affected every aspect of her life, from her finances to her physical health to her county career. The administrative deputy and

director met with her that morning about her ability to be approved for leave under the FMLA. "The director previously informed me that I had never been approved for FLMA. I provided a printout obtained through Ecaps clearly showing I was approved for FMLA in 2012. They then informed me that the problem is the 30day suspension (which by the way was partially rescinded) is not being counted as time worked making me ineligible to FMLA. This is totally unfair given the fact that 1) the 30days without pay portion [of] the suspension was rescinded and 2) I have not been made whole and am now working under undue stress and in a hardship as [a] result of this travesty. I have contacted SEIU and informed this administration that I would be in contact with any and all parties that would once and for all fix this and make me truly whole. [¶] . . . [¶] . . . It is my hope that all parties concerned will come together and rectify this injustice once and for all. By clearing my name, restoring my time, restoring all benefits, restoring my ability to promote and returning me to the office that I worked at before September [17,] 2013."

In May 2014, Neal presented Young with a "confirmation of conference" based on the events that took place on September 17, 2013, at the Vermont facility. Young considered it excessive discipline to be required to report directly to the director, rather than the supervisor or deputy. She also believed it was excessive discipline to be written up at the Central location in May 2014 for an incident that

occurred at the Vermont location the previous year and had nothing to do with the Central location.

Young submitted an email that she sent on Friday, May 23, 2014, to several individuals, including Spiller, Neal, Buzo, Dillard and a union representative, as follows: "I just received the attached [at 9:00 a.m.] from the Director with the Admin. Deputy present here at South Central. I am leaving to go to Kaiser. [M]y blood pressure is clearly up. I will not accept any form of write up/warning regarding the event that occurred 09/17/2013 at [the Vermont facility]. I [have] already been wrongfully subject to a 30day Suspension Without Pay (administered illegally) and forced to come to South Central creating a hardship on me and my family. . . . How many times does the County of Los Angeles think that [they can] unjustly punish me for something that I did not do and expect me to take it? I have been in hell for 8 months and it is time for it to stop. [¶] I want an apology for this and I want all material related to it removed from ALL my files. Every action from here on in must be documented. [T]here will be no backdoor deals made on my behalf regarding my life and career. If the County of Los Angeles and SEIU721 will not (OR) cannot resolve this I will take [it] as far as I have to clear my name and make this right. [¶] I have requested to meet with the Director, Sheryl Spiller because . . . all other parties have not been able to amicably resolve this very important matter."

Three months later, Young resigned. On September 5, 2014, O'Brien sent an email to another human resources

employee asking if Young had resigned. The employee responded, "She left on August 30th for 'working conditions.' The print-outs are on your desk." O'Brien forwarded the email to Dillard, Venter-Bowles, Spiller and Garcia, noting, "I thought you would find this interesting." Spiller responded, "Are you saying that she resigned? Are we looking for a lawsuit to follow???" O'Brien replied, "Yes, she resigned and completed the exit form stating her reason was for, 'poor working conditions.' [¶] A wrongful termination or an FLSA claim may be forthcoming. She has two grievances pending at the 3rd level that were filed in May 2014: [¶] 1– Confirmation of counseling—to be removed; and [¶] 2– FMLA denial and a suspension. [¶] Also, an employee has restoration rights up to one year based on management discretion. Do you want a 'top of file' referral on this?" Spiller responded, "Of course. I'm sure that a 'top of file' would be your recommendation, correct?" O'Brien replied, "You got it!"

### D. Additional Evidence

Young submitted the deposition testimony of Counts as to the following facts. An employee who has left employment with the County may request to be reinstated within the first two years of separation. Reinstatement in those cases goes through the same process as a transfer or promotion candidate, which involves a background clearance. Young was eligible to apply for reinstatement. She was not

28

reinstated because she had a five-day suspension for attendance issues in 2011, she had a conference on file for a bad boss campaign in which she was an active participant, she had unauthorized absences on three occasions between August 2013 and December 2013, and there was a substantiated investigation by CEOP that had not been assessed because Young had already resigned from service. Counts did not know the substance of the investigation or whether Young participated at all.

Counts stated that the County determined Young was not the instigator of the September 2013 incident. The primary instigators were union staff members, who the County had no jurisdiction to discipline. Young was repaid the money taken during the suspension. Young was issued a conference memo on the ground that she should have had better judgment to see that what had started out as a union activity became something much more. The conference memo was one of the documents that ended up being reviewed in her request for reinstatement.

No other County employees were suspended for participating in the incident. The union staff was the driving force and Young participated. The County had authority to discipline any employees that they knew to be actively participating. Young was an active participant, because she held the bill of rights and yelled the contents at Huizar, according to Huizar, who felt threatened and was fearful. Counts did not recall the names of any of the other employees who were referred to her other than the union

staff and Young.  Later, she learned that there were more than 10 people.  Huizar was the reporting party, and her statement was taken.  Counts is not aware that anyone interviewed Young or took her statement before she was given the oral suspension.  Counts stated that the correction action for Young was that she was issued a confirmation of conference and was moved to a new office.

When Counts sent an email to O'Brien about the representative who would attend the Skelly hearing, O'Brien responded, "Good.  Thanks.  She needs to be prepared for trouble."

Young submitted Dillard's deposition testimony as well.  Because Huizar was injured and Young was an employee involved in the incident, Dillard, O'Brien, and Venters-Bowles determined that Young could not return to the Vermont facility.

Young submitted Huizar's deposition testimony.  After the incident on September 17, 2013, Huizar handwrote an affidavit describing the incident at Dillard's request.  She listed the individuals from the union who had come to the office without authorization, as well as Young and several other individuals who came into the administration area, approached her office, demanding for her to let them in and demanding to meet with her.  She typed a second affidavit the next day, which she turned in to document her side of the events.  Huizar made a police report on the day of the incident against Valdez, stating that she came into the workplace and pushed Huizar with the door, injuring her

arm.  Huizar believed there were approximately 20 employees involved in the incident.

Young submitted the deposition of Spiller.  She recalled meeting Young, Polee, and another employee at a Board meeting in August 2012.  When O'Brien informed her that Young had resigned, they agreed to put a "top of file" on Young's file.  "Top of file" means placing information relative to the employee's work history at the top of their personnel file so that if someone reviews the file, they will not miss it.

Young submitted Chavez's deposition testimony as well.  She explained that Counts reviews the recommendation from the processing unit and Spizer makes the final determination based on the recommendation from Counts.  Chavez compiled data produced to Young about other former employees whose requests for reinstatement had been denied.  The reasons for denial were listed for each employee.  A few of the entries stated, "Top of File: Employee was suspended" or "Top of file marked 'Do not Rehire.'"  Asked to explain what "top of file" meant, Chavez said Counts's section would submit recommendations using that language.  When Chavez conducted a field check, she requested the personnel folder.  There would be a form on the personnel file that sometimes stated, "do not rehire." There was no other information on the top of file form.  If the person was classified as "do not rehire," it was usually a person who had been discharged.  Chavez has never seen "do not rehire" on a file where the person had not been discharged, but instead had simply resigned.

31

## Reply and Trial Court Ruling

The County submitted a reply.  The County argued that the only actionable adverse employment action in connection with the Labor Code section 1102.5 retaliation claim was the failure to reinstate Young.  The County had legitimate, non-retaliatory reasons for the adverse actions taken, which Young had not rebutted.  The adverse actions that were alleged after her transfer in October 2013 were not sufficiently connected to her protected activity.  She had not shown a nexus between the unpleasant experiences in her new work environment and her protected activity.  There was no admissible evidence that anything that happened in her new department was due to her engaging in protected activity in the form of complaining about a racially segregated work assignment in her prior department.  Young had not even shown that the County intentionally created or knowingly permitted working conditions that were so intolerable at the time of Young's resignation that a reasonable person would have been compelled to resign.  The post-transfer actions such as being seated under an air conditioning vent, having security clearance issues, dissatisfaction with the equipment at her workstation, and denial of FMLA leave were single, trivial or isolated acts that, viewed together, did not rise to the level of meeting the standard for constructive termination.  Young could not pursue a claim under Labor Code section 1102.5 based on the alleged constructive termination, because the trial court

had already ruled that the post-transfer events were not tethered to the protected activity.

The County submitted a document from Young's personnel file entitled "Top of File" with individual entries summarizing her employment history, beginning with a transfer in 1997. The most recent entry on the document was a promotion in 2007. It did not list Young's transfer in 2013 or her separation from employment in 2014.

A hearing was held on August 30, 2018. The trial court took the matter under submission. On September 6, 2018, the trial court granted the motion for summary adjudication as to all of the remaining causes of action. The trial court entered judgment in favor of the County on October 29, 2018. Young filed a timely notice of appeal.

## DISCUSSION

### Retaliation in Violation of FEHA

Young contends that the complaint stated a cause of action for retaliation in violation of the FEHA, including exhaustion of her administrative remedies. We agree.

#### A. Statutory Scheme and Standard of Review

The FEHA makes it an unlawful employment practice to discharge a person from employment or discriminate against the person in the terms, conditions, or privileges of

employment, because of race.  (Gov. Code, § 12940, subd. (a).)  The FEHA also makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  (§ 12940, subd. (h).)

To establish a prima facie case of retaliation under the FEHA, a plaintiff must show "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action."  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

"A demurrer tests the sufficiency of a plaintiff's complaint by raising questions of law.  On appeal, we exercise our independent judgment to determine whether the complaint states a cause of action.  [Citation.]  A trial court errs in sustaining a demurrer when the plaintiff has stated a cause of action under any possible legal theory.  [Citation.]  In conducting our review, we must accept as true all properly pleaded material facts and facts that may be inferred from these allegations, but we do not accept the truth of contentions, deductions or conclusions of law.  [Citation.]  We are not bound by the trial court's stated reasons and must affirm the judgment if any ground offered in support of the demurrer was well taken."  (*Acuna v. San*

*Diego Gas & Electric Co.* (2013) 217 Cal.App.4th 1402, 1411 (*Acuna*).)

### B. Exhaustion of Remedies

The County contends Young failed to exhaust her administrative remedies, because the adverse employment actions occurred more than a year before Young filed her 2015 DFEH charge, and could not be revived by filing a new charge in 2016. The County further contends that the 2016 DFEH charge was too uncertain to allege exhaustion of administrative remedies. We conclude that Young alleged a continuing violation with at least one occurrence during the statutory time period covered by her 2015 DFEH charge, which a reasonable investigation by the DFEH would have revealed.

An employee must exhaust his or her administrative remedies by filing a verified complaint with the DFEH and obtaining a right-to-sue notice before filing a judicial action under the FEHA. (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 153 (*Wills*).) The DFEH complaint must be filed within one year of the unlawful acts, set forth the name of the person or entity that committed the unlawful practice and the particulars of the alleged acts. (Gov. Code, § 12960, subd. (c).) An "unlawful practice" may be a distinct act, such as termination or failure to hire, or it may be a course of conduct occurring over a period of time. (*Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598–599 (Brown).)

"The FEHA statute of limitations ordinarily bars recovery for acts occurring more than one year before the filing of the DFEH complaint. (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1402.)" (*Brown, supra,* 37 Cal.App.5th at p. 599.) However, "the continuing violations doctrine may toll the section 12960 accrual period if the employer engaged in a series of continuing and related FEHA violations and at least one of those violations occurred within the one-year period. (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 811–824 (*Richards*).)" (*Acuna, supra,* 217 Cal.App.4th at p. 1412.) "Under this doctrine, an employer can be liable for conduct outside the limitations period 'if the employer's unlawful actions are (1) sufficiently similar in kind . . . [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence.' ([*Richards, supra,* 26 Cal.4th at p. 823].)" (*Brown, supra,* 37 Cal.App.5th at p. 599.)

When an employee is subject to a continuing course of retaliatory actions under the FEHA, the limitations period does not necessarily start to run when the employee first believes his or her rights have been violated. (*Richards, supra,* 26 Cal.4th at p. 824; *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 270 (*Nazir*).) "[W]hen a continuing pattern of wrongful conduct occurs partly in the statutory period and partly outside the statutory period, the limitations period begins to accrue once an employee is on notice of the violation of his or her rights *and* on notice that 'litigation, not informal conciliation, is the only alternative

36

for the vindication of his or her rights.'  ([*Richards*, *supra*,] 26 Cal.4th at p. 823.)"  (*Acuna*, *supra*, 217 Cal.App.4th at p. 1412.)  Under the continuing violations doctrine, the limitations periods begins to run when the course of conduct ends, such as when the employer ceases the conduct or the employee is separated from employment, or the employee is on notice that further efforts to resolve the conduct will be futile.  (*Richards*, *supra*, 26 Cal.4th at p. 824; *Nazir*, *supra*, 178 Cal.App.4th at p. 270.)  "The Supreme Court has extended the continuing violation doctrine to retaliation claims.  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1059.)"  (*Nazir*, *supra*, 178 Cal.App.4th at p. 270.)

The plaintiff must specify an act violating the FEHA in the administrative charge in order to file a lawsuit based on that act.  (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1724.)  The scope of the civil complaint is limited to the scope of the administrative charge, the completed administrative investigation, or any investigation that might reasonably have been expected to grow out of the administrative charge.  (*Nazir*, *supra*, 178 Cal.App.4th at p. 266.)  The exhaustion requirement is satisfied if FEHA claims in the judicial complaint are "'like and reasonably related to'" those in the DFEH charge (*Wills*, *supra*, 195 Cal.App.4th at p. 154) or "likely to be uncovered in the course of a DFEH investigation" (*Okoli v. Lockheed Technical Operations Co.* (1995) 36 Cal.App.4th 1607, 1617 (*Okoli*)).

We construe the administrative charge liberally. (*Nazir*, *supra*, 178 Cal.App.4th at pp. 266–267.) The language of a DFEH complaint "'"need not presage with literary exactitude the judicial pleadings which may follow."'" (*Id.* at p. 267.) The charge is sufficient if it apprises the administrative agency of the alleged acts in general terms. (*Ibid.*) The purpose of the administrative charge is to initiate the investigatory and conciliatory procedures of the administrative agency, not to limit the plaintiff's access to the courts. (*Saavedra v. Orange County Consolidated Transportation Agency* (1992) 11 Cal.App.4th 824, 827.)

In this case, the operative complaint alleged a cause of action for retaliation in violation of the FEHA, including continuing violations which tolled the statute of limitations to file an administrative charge. At the County's request, the trial court took judicial notice of Young's 2015 administrative charge, which had alleged retaliation for opposing an unlawful activity, including, but not limited to, involuntarily moving Young to another district and failing to replace time taken for the purposes of FMLA. Young was involuntarily transferred to the new district in October 2013, more than one year prior to the date that she filed her 2015 administrative charge. But the limitations period did not necessarily begin to run when she first believed her rights had been violated.

The allegations of the complaint show the statute of limitations was tolled by the continuing violations doctrine,

38

because Young was subjected to a series of continuing violations that were sufficiently similar in kind, occurred with reasonable frequency, and did not acquire a degree of permanence until she felt forced to resign as a result of her working conditions. The evidence provided by the County in support of the motion for summary judgment, of which we have taken judicial notice on appeal, shows the discipline imposed for the September 17, 2013 incident included the involuntary transfer to the Central facility in 2013 and a confirmation of conference provided 10 months later in May 2014, which was within the one-year period of Young's administrative charge. Young alleged that in connection with her transfer to the Central facility, the County revoked the security clearance that she needed to perform her job function and did not restore the clearance during the time that she worked at the Central facility. The County informed her new supervisors and co-workers at the Central facility that she had been transferred because she assaulted a director at the Vermont facility, which the County knew was not true. The time withheld during the month that she was suspended was not replaced, although the suspension was revoked and despite repeated attempts to have the accounting corrected while she was at the Central facility. Three months after the confirmation of conference was delivered to her at the Central facility, she felt her working conditions had become so intolerable that she was compelled to resign. Following her resignation she had certain reinstatement rights, but management employees took

39

action to prevent her from being reinstated as part of their retaliatory conduct. It is reasonable to conclude that a DFEH investigation of the allegations in the 2015 administrative charge would lead to investigation of the County's subsequent retaliatory acts within the statute of limitations. Young's DFEH charge was sufficient to exhaust administrative remedies as to her claim for retaliation.

## Retaliation Against a Whistleblower in Violation of Labor Code Section 1102.5

Young contends triable issues of fact exist as to her cause of action for retaliation under Labor Code section 1102.5. We agree.

### A. Statutory Scheme and Standard of Review

Labor Code section 1102.5, subdivision (b), prohibits an employer from retaliating against an employee "for disclosing information . . . to a government or law enforcement agency . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." The purpose of the statute is to "'encourag[e] workplace whistle-blowers to report unlawful acts without fearing retaliation.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 287.)

40

"A retaliation claim may be proved in two different ways." (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 138 (*Mokler*).) "First, a plaintiff may prove retaliation by circumstantial evidence. In these cases, the plaintiff is required to first establish a prima facie case of retaliation. Once established, the defendant must counter with evidence of a legitimate, nonretaliatory explanation for its acts. If the defendant meets this requirement, the plaintiff must then show the explanation is merely a pretext for retaliation. (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 (*Patten*); see also *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453 [(*Akers*)].)" (*Mokler*, *supra*, 157 Cal.App.4th at p. 138.)

"Second, retaliation may be proved by direct evidence. 'Where a plaintiff offers direct evidence of discrimination that is believed by the trier of fact, the defendant can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the unlawful factor.' (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67–68 (*Morgan*).) Where direct evidence of retaliation is shown, the burden shifting analysis imposed in circumstantial evidence cases does not apply. (*Id.* at p. 68.)" (*Mokler*, *supra*, 157 Cal.App.4th at p. 138.)

41

## B. Prima Facie Case

For the purposes of summary adjudication, the County conceded that triable issues of fact exist as to whether Young engaged in a protected activity. The County argued instead that Young cannot establish a prima facie case of retaliation because there is no evidence of a causal link between her protected activity and the adverse employment actions alleged. We disagree.

"To establish a prima facie case of retaliation 'a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two.' (*Patten*, *supra*, 134 Cal.App.4th at p. 1384.) An employee engages in protected activity when she discloses to a governmental agency '"reasonably based suspicions" of illegal activity.' (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 86–87.)" (*Mokler*, *supra*, 157 Cal.App.4th at p. 138.)

The same definition of "adverse employment action" applies to lawsuits brought under Labor Code section 1102.5, subdivision (b), as applies in FEHA retaliation lawsuits. (*Patten, supra*, 134 Cal.App.4th at p. 1387.) An adverse employment action for purposes of retaliation under Labor Code section 1102.5 requires that the adverse action materially affect the terms and conditions of employment. (*Ibid.*) "The 'materiality' test encompasses not only ultimate employment decisions, 'but also the entire spectrum of

42

employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career.' [Citation.] Minor or relatively trivial adverse actions by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee do not materially affect the terms or conditions of employment. [Citation.] But the terms or conditions of employment 'must be interpreted liberally and with a reasonable appreciation of the realities of the workplace [to further the fundamental antidiscrimination purposes of the FEHA].' [Citation.]" (*Ibid*.)

Young's evidence showed that she reported discrimination on the basis of race to multiple different government employees beginning in March 2012 and continuing through September 17, 2013. She reported violations of other legal rights as well. On September 17, 2013, Young participated in bringing complaints about these legal violations to the attention of the director of the Vermont facility. The County suspended her that same day, without an interview to ascertain her side of the facts, and transferred her employment to another facility. The County disclosed to her new supervisors and co-workers that she had been transferred because she assaulted a director at the previous facility, which was untrue. The County frustrated her ability to perform her job at the Central facility by revoking the security clearance that she needed for her job function and failing to respond to her requests for an

43

ergonomic work station to accommodate her disability. She repeatedly requested correction of her leave account for purposes of FMLA, which was not completed. Instead, the director of the Central facility delivered a confirmation of conference for the events of September 17, 2013, which standing alone was sufficient disciplinary action to prevent her from being reinstated. Within three months, Young felt compelled to resign as a result of these working conditions. There was temporal proximity between Young's whistleblowing activity and the retaliatory course of conduct that occurred within less than a year and materially affected the terms and conditions of her employment. Young submitted evidence from which the trier of fact could conclude that she established a prima facie case of retaliation and the burden shifted to the County to provide legitimate, non-retaliatory reasons for the adverse employment actions taken against her.

## C. Reasons Not Offered for Many Adverse Employment Actions

The County failed to provide legitimate, non-retaliatory reasons for most of the actions at issue. "Once an employee establishes a prima facie case of retaliation, the burden shifts to the employer 'to offer a legitimate, nondiscriminatory reason for the adverse employment action.' (*Morgan*, *supra*, 88 Cal.App.4th at p. 68.)" (*Mokler*, *supra*, 157 Cal.App.4th at p. 140.)

The County provided no evidence concerning the decision to transfer Young to the Central facility or to not restore Young's leave time after her suspension was revoked. There was no evidence as to why Young's security clearance was revoked. The County did not explain why Young received a confirmation of conference ten months after the incident that precipitated it. Therefore, the County did not meet its burden with respect to most of the adverse employment actions taken against Young.

The sole action that the County addressed was the failure to reinstate Young. The County provided evidence showing legitimate, non-retaliatory reasons that her request for reinstatement was denied.

### D. Pretext

Young submitted evidence of pretext to raise a triable issue of fact on the issue of whether reinstatement was denied in retaliation for her complaints of discrimination and illegal activity.

"Once the employer meets its burden, the burden then shifts back to the plaintiff to prove the employer's proffered reasons for termination are pretextual. (See *Morgan*, *supra*, 88 Cal.App.4th at p. 68.) "'[T]he plaintiff may establish pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence.”’” (*Id.* at p. 68.)” (*Mokler*, *supra*, 157 Cal.App.4th at p. 140.)

In this case, Young presented evidence that between 20 and 30 employees participated in the September 17, 2013 incident, but she was the sole employee to be disciplined. The County's management, upon hearing that she had resigned as a result of her working conditions, agreed to put a note on her file. Viewing the evidence in the light most favorable to Young, a trier of fact could infer from the tone and context of the management email messages that a "top of file" notation was an instruction not to rehire Young. In fact, Young presented evidence that another union shop steward who participated in many of the same events resigned and was reinstated, although she had a greater number of absences than Young and more significant disciplinary history.

Young's evidence raised a triable issue of fact on the issue of pretext. The judgment must be reversed as to the cause of action for retaliation in violation of Labor Code section 1102.5.

## DISPOSITION

The judgment is reversed.  The trial court is directed to enter a new and different order overruling the demurrer to the cause of action for retaliation in violation of the FEHA and sustaining the demurrer in all other respects.  The trial court is also directed to enter a new and different order denying the motion for summary adjudication as to the cause of action for retaliation in violation of Labor Code section 1102.5, and granting the motion in all other respects. Appellant Lorna Young is awarded her costs on appeal.


MOOR, J.

We concur:



BAKER, Acting P. J.



KIM, J.